IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 13, 2013

**STATE OF TENNESSEE v. TROY LLOYD**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 1101817      James C. Beasley, Jr., Judge**

**No. W2012-01990-CCA-R3-CD  - Filed December 12, 2013**

A Shelby County jury convicted the Defendant, Troy Lloyd, of one count of possession of
a controlled substance with intent to deliver.  The trial court imposed an effective sentence
of fifteen years in the Tennessee Department of Correction.  On appeal, the Defendant
contends that the evidence is insufficient to sustain his conviction.  We affirm the trial court's
judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ALAN E. GLENN
and ROGER A. PAGE, JJ., joined.

Harry E. Sayle, III (on appeal), and Rusty White (at trial), Memphis, Tennessee, for the
Appellant, Troy Lloyd.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney
General; Amy P. Weirich, District Attorney General; Kate Edmands, Assistant District
Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the discovery of 1,003 grams of cocaine in the Defendant's
duffel bag.  For this offense, a Shelby County grand jury indicted the Defendant for unlawful
possession of a controlled substance with intent to sell and unlawful possession of a
controlled substance with intent to deliver.  The following evidence was presented at trial:

Detective William Acred testified that he was employed with the Memphis Police

Department and was on the Drug Response Unit at the time of this crime. He stated that he was assigned a "drug detector dog" in 2008, and his dog's name was "Buddy." He stated that he and Buddy had been trained together at the National Police Canine Association, and that every year he was required to get re-certified with Buddy. He testified that a dog's nose is anywhere from fifty to a hundred times stronger than a human's, and that a dog can smell drugs in places where humans cannot. Detective Acred testified that Buddy is a "passive alert dog," meaning that his response to the odor of drugs is to "sit" and change his behavior. The behavior changes include an increase in breathing, or opening his mouth.

Detective Acred testified that on November 9, 2010, he was assigned to go to the Greyhound bus station in Memphis to conduct security measures, including checking passengers for contraband or weapons before they got on buses. He recalled doing a search of a bus that arrived from Dallas, TX, and explained that, in his experience, buses traveling from west to east often have illegal drugs on them. When the Dallas, TX bus arrived at the bus terminal, Detective Acred greeted each passenger as they stepped off the bus and asked them to put their bag on the ground, so he could "run [Buddy] by the bag." He stated that Buddy did not give any "positive alerts" to the passengers' bags.

Detective Acred testified that after all the passengers had left the bus, he boarded the bus with Buddy and the bus driver alerted him that one bag had been left behind. Detective Acred knew that Memphis was the final destination for this bus, so all the passengers should have taken their bags when they exited the bus. Detective Acred said he thought it was "extremely suspicious" that someone would leave a bag on the bus when there was a drug dog present. He said he "ran Buddy by the bag," and received a positive alert for drugs from Buddy. He could see a big change in Buddy's behavior once he sniffed the bag, "you could hear his breathing pick up, working the area around the odor of the bag, and then [Buddy] sat and stared right at the bag." Detective Acred testified that in his opinion, this was a positive alert for the presence of the odor of narcotics.

Detective Acred testified that he removed the bag from the bus and a second drug dog indicated that drugs were present in the bag. Detective Acred then walked through the bus terminal looking for the owner of the bag. Bus terminal employees announced over the loudspeaker that someone had left a green duffel bag on the Dallas bus. After 45 minutes, when no one had claimed the bag, the bag was determined to be abandoned and was opened by police. Inside the duffel bag police found clothing, three cellular phones, and a "brick-shaped object" wrapped in cellophane, surrounded by a "red fluid substance." While Detective Acred watched, another officer pulled a pink slip of paper out of the duffel bag. At the top of the "pink document" was the following heading: "District Court Dallas County, Texas. State of Texas versus Troy Lloyd." Detective Acred said that, based on the name on the pink document, he and other officers attempted to locate the Defendant. Detective Acred

testified that he obtained a copy of a bus ticket from the bus driver, showing a male by the same name as the Defendant was a passenger. The police obtained a physical description of the Defendant from the bus driver, and then split up to search the businesses surrounding the bus station.

Detective Acred testified that a short time later, Sergeant Murray Wilson returned to the bus station with the Defendant, who had been across the street from the terminal at a Denny's Restaurant. Detective Acred identified the Defendant in the courtroom as the man brought to the bus station that day. He testified that the police searched the Defendant at the bus station, and found a bus ticket, a cell phone, and his identification. He stated that the bus ticket indicated that the Defendant's ticket originated in Dallas, Texas, and indicated that he was scheduled to take another bus out of Memphis. Following the search, the police transported the Defendant to the Organized Crime Unit office, where Detective Acred interviewed the Defendant.

Detective Acred testified that while in the interview room, he advised the Defendant of his *Miranda* rights and the Defendant signed an Advice of Rights form. Detective Acred testified that he witnessed the Defendant signing his name, and then he signed the form too. The Advice of Rights form was introduced into evidence at trial.

Detective Acred recalled that when he was explaining *Miranda* rights and the Advice of Rights form to the Defendant, the Defendant indicated that "he wanted to give a statement," because the cocaine found in his duffel bag was "not [his]" and he was "taking it to Chicago for somebody in Dallas and they were going to pay [the Defendant] $1,000 to transport it for them because [the Defendant] was already taking a trip to Chicago to see [his] aunt." Detective Acred said that he was talking to the Defendant for "a few minutes about his involvement" and that after "about five minutes," the Defendant looked at Detective Acred and said, "[d]o you think it'd be better if I had an attorney present." Detective Acred recalled that he told the Defendant it was his decision and that he had already been advised of his rights. Detective Acred testified that after the Defendant asked for an attorney, he ceased all questioning of the Defendant. Detective Acred explained that this occurred before he was able to develop a written statement from the Defendant. The Defendant told Detective Acred that he no longer wanted to provide a written statement and wanted to indicate so on the Advice of Rights form. Detective Acred had the Defendant "draw a line" through where he had indicated he wanted to give a written statement on the Advice of Rights form. The Defendant also wrote "not without an attorney."

Detective Acred testified that after the Defendant changed his Advice of Rights form, he told the Defendant that he was going to be charged with a crime. At that point, the Defendant said he had changed his mind again, and would give Detective Acred a statement.

Detective Acred said that he then provided the Defendant with a second Advice of Rights form, and the Defendant began filling it out. Detective Acred left the interview room, and when he returned, another detective informed him that the Defendant had changed his mind again and did not want to give a statement.

On cross-examination, Detective Acred testified that Buddy can smell drugs up to six or seven feet away, and that Buddy "responded" to the Defendant's duffel bag when he was "within a couple of feet of the duffel bag[.]" He stated that after the duffel bag was taken off the bus, it sat for thirty to forty-five minutes before it was opened, and that another detective, Officer Angela Workman, was with the bag for that entire period of time. Detective Acred recalled that Sergeant Wilson opened the duffel bag, and then located the "brick-shaped object in cellophane" inside the bag, and "stuck his knife" in the object. After finding that object, a third detective, Detective Ammons, went through the contents of the bag and found the pink document with the Defendant's name on it.

On re-direct, Detective Acred testified that he was standing two or three feet away when Sergeant Wilson opened the green duffel bag, and that they both saw the brick-shaped object inside the bag. He stated that Detective Ammons was going through the rest of the duffel bag, and that he "personally saw" Detective Ammons pull the pink document out of the duffel bag. He stated that no one had the opportunity to "plant" the pink document in the duffel bag. Detective Acred said that immediately after the bus driver found the Defendant's bag on the bus in the overhead space, the bus driver pulled down the bag and alerted the detective.

Officer Angela Workman testified that she responded to the scene at the Greyhound bus station and took custody of the evidence, including the duffel bag and the items found in the duffel bag, and logged the evidence into the property room. The three cellular phones were admitted into evidence, as was 2.3 pounds of cocaine and the pink document. Officer Workman stated that she maintained control of the evidence that was recovered until she took it to the property room.

On cross-examination, Officer Workman testified that she never boarded the bus where the duffel bag was found, and that all the evidence she collected was found in the duffle bag. She stated that when she took control of the duffel bag, it was on the pavement approximately fifty feet from the bus. Her focus was "on the bag and making sure nobody messed with it." She denied seeing anyone place the pink document inside the bag, and denied that she placed the pink document inside the bag.

Sergeant Murray Wilson testified that he was assigned to the Interstate Criminal Interdiction Task Force as a canine handler, and responded to the Memphis Greyhound bus

station on November 9, 2010. He stated that he boarded the bus that arrived in Memphis from Dallas, Texas, and announced to the passengers over the loudspeaker that the Memphis Police Department would be conducting a "saturation of criminal activity" at the bus station. He told the passengers as they were exiting the bus, "if they would not mind to allow one of our narcotic detection canines to smell their bag." Officer Wilson then exited the bus and retrieved his drug dog, named "Xena," and "detailed her on the luggage compartment area and the luggage that came off the bus from underneath." He stated that Xena did not give any "positive alerts" for the bags that came from the luggage compartment.

Sergeant Wilson testified that he then became aware that Detective Acred and Buddy had a "positive alert" from a bag that was on the bus, and so Sergeant Wilson detailed Xena on the bag as well and received a positive alert from her. He stated that Xena is a "passive alert dog" who sits when she is near narcotics. After the positive alerts from Buddy and Xena, he and Detective Acred attempted to find the owner of the bag, but no one claimed it. Sergeant Wilson then went to the service desk at the bus station and procured an announcement over the PA system that a green duffel bag had been found and needed to be claimed. No one responded to the announcement regarding the green duffel bag, so officers declared the bag abandoned and opened it. From inside the bag, police recovered a pair of pants and a pink document, "court documentation" from Dallas, Texas, with an individual's name and birth date on it. Sergeant Wilson stated he was present when the bag was opened and present when the pink document was recovered.

Sergeant Wilson testified that it was Detective Ammons who recovered the pink document from the duffel bag, and that he was standing "right beside" Detective Ammons when this happened. Sergeant Wilson stated that the Defendant's name was on the pink document, and it was "determined on the passenger manifest [that] there was a Troy Lloyd" on the bus from Dallas. He stated that they contacted Dallas authorities and obtained a picture of the Defendant. Police used the photograph to search for the Defendant in the downtown area. Sergeant Wilson stated that he and Detective Ammons went to a Denny's restaurant across the street from the bus station, and upon entering, they saw the Defendant sitting in the corner eating breakfast. Sergeant Wilson said he "immediately" recognized the Defendant. Sergeant Wilson approached the Defendant and asked if he had identification. The Defendant pulled out his wallet, which contained a social security card with the name "Troy Lloyd" on it. Sergeant Wilson took the Defendant into custody and returned to the bus terminal.

On cross-examination, Sergeant Wilson testified that when he approached the Defendant at Denny's, he seemed nervous and "he obviously knew [the police] were there to see him." Sergeant Wilson stated that passengers on the Greyhound bus had the right to refuse to have their luggage sniffed by the drug dogs. He stated he was not present when the passengers walked past Detective Acred and Buddy. Sergeant Wilson denied placing the

pink document with the Defendant's name on it in the duffel bag.

On re-direct, Sergeant Wilson identified the Defendant sitting in the courtroom as the man he arrested at Denny's restaurant.

Lieutenant Michael McCord was certified as an expert in narcotics and drug trafficking. He testified that the drugs were tested in the lab, and the drugs were confirmed as 1,003 grams of cocaine, which is the "street" equivalent to a kilo of cocaine. He testified that in his opinion, one "never" sees drug users with that amount of cocaine. Lieutenant McCord testified that a kilo of cocaine, broken down, would be worth about $100,000 in a city like Chicago. He testified that in his experience, cocaine comes into the United States over the Mexican border, and then typically is trafficked to the northern states, where it is worth more money. He testified that, in his experience, methods for transferring cocaine throughout the country include via UPS in a package, on a bus or in the compartment of a car, inside the clothing on a person, or via U.S. mail.

Lieutenant McCord was asked to examine the brick-shaped object containing the cocaine for the jury. When opening the packaging, he identified the "red fluid" substance as transmission fluid, or "marvel mystery oil," which he said is used by drug traffickers to mask the scent of the drugs to throw off the drug dogs. He said the fluid also hinders the police from obtaining fingerprints from the drug packaging. Lieutenant McCord testified drugs are commonly trafficked through Memphis on the Greyhound bus service, as well as the Amtrak train service and at the Memphis International Airport. He testified that he was familiar with the Dallas to Memphis Greyhound bus route, and that this particular route was one he focused on in drug trafficking investigation operations. He testified that it is common to find multiple cellular phones, as well as masking agents to cover up the smell of drugs, on people who are selling or delivering drugs. Lieutenant McCord testified that he had worked cases at the Greyhound bus station in Memphis in the past, including cases involving abandoned bags on the buses.

The Defendant testified that the green duffel bag was not his bag. He denied making any statements of ownership to Detective Acred. He stated that he was not traveling to Chicago but that he was going to Champaign, Illinois, where he lived. He said that prior to living in Illinois, he lived in Dallas. He denied transporting drugs for anyone. He stated that he was taking care of "a situation" in Dallas, and, at the time of his detention, he was returning to Champaign to pick up clothes.

The Defendant testified that when he arrived in Memphis, he stepped off the bus and told the waiting police officer that he did not have any bags. His plan was to then eat breakfast at Denny's restaurant before getting back on the bus to go to Champaign. The

Defendant said that the only cellular phone he had was the one the police found on his person, and that the three cell phones found in the duffel bag were not his.

The Defendant testified that he was arrested and taken to the police station for questioning. He again denied making a statement to Detective Acred, and maintained that he did not agree to give a statement without an attorney. He testified that he never said he wanted to give a statement. The Defendant stated that the pink document was in his coat pocket when he got on the bus, and he never put it in the duffel bag. The Defendant reiterated that he did not have any luggage for his trip because he was going to pick up clothes. On cross-examination, the Defendant testified that the duffel bag found on the bus was not his. He maintained that he never agreed to give a statement to the police. On re-direct, the Defendant testified that he had never seen the cocaine or the cellular phones before.

Based upon this evidence, the Defendant was convicted of possession with intent to deliver 300 grams or more of cocaine. The trial court sentenced the Defendant to an effective fifteen-year sentence. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction. The State responds that the Defendant's appeal should be dismissed because his notice of appeal was not timely filed, and the Defendant has not sought a waiver of the timeliness requirement. In the alternative, the State argues that the evidence is sufficient to sustain his conviction. We first address the issue regarding the Defendant's filing of his notice of appeal.

### A. Notice of Appeal

The judgment against the Defendant was entered on December 8, 2011, and the Defendant's subsequent motion for new trial was denied on August 8, 2012. The Defendant had thirty days after this date to file his notice of appeal. Tenn. R. App. P. 4(c). The Defendant, however, did not file his notice of appeal until September 10, 2012. The Defendant's counsel offers an explanation for the delayed filing, stating that he miscounted the number of calendar days in August and filed the notice of appeal on what he believed to be the next business day after September 8, 2012.

"In all criminal cases, the notice of appeal document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). Given the Defendant's counsel's explanation of the confusion of dates, we conclude the interest of

justice is served by waiver of the untimely filing of the Defendant's notice of appeal. Accordingly, we turn to address the Defendant's sufficiency challenge.

## B. Sufficiency of the Evidence

The remaining issue is the Defendant's contention that the evidence is insufficient to support the Defendant's conviction for unlawful possession with intent to deliver 300 grams or more of cocaine. The Defendant argues that the State did not prove beyond a reasonable doubt that he was the owner of the green duffel bag found on the bus. The States responds that the green duffel bag containing clothing in the Defendant's size, the pink document with the Defendant's name on it found inside the duffel bag, and the Defendant's statement to police that he was transporting the cocaine to Chicago is sufficient evidence that the Defendant possessed the cocaine with the intent to deliver. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn.

1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

It is an offense for a defendant to knowingly . . . [d]eliver a controlled substance; . . . or . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(2), (4) (2006). The term "possession" embraces both actual and constructive possession. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). In order for a person to "constructively possess" a drug, that person must have "'the power and intention at a given time to exercise dominion and control over ... [the drugs] either directly or through others.'" *Id.* (quoting *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)). Additionally, "it may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419.

The evidence presented at trial, viewed in the light most favorable to the State, proved that on November 9, 2011, the Defendant was a passenger on a Greyhound bus traveling from Dallas, Texas to Memphis, Tennessee. When the bus arrived at the Greyhound bus station in Memphis, the local police announced to all the passengers that with their consent their bags would be sniffed by drug dogs. The Defendant got off the bus without a bag and went across the street to a Denny's restaurant. A subsequent search of the bus revealed that a green duffel bag had been left on the bus. Inside the duffel bag was a kilo of cocaine and a pink document from the Dallas courthouse naming the Defendant. This is sufficient evidence from which the jury could conclude beyond a reasonable doubt that the Defendant was in possession of the cocaine found in the duffel bag. A narcotics expert testified that the

amount of drugs found in the green duffel bag is typically possessed by drug traffickers or sellers, and that a drug user is "never" seen with such a large amount of cocaine. When questioned by police, the Defendant initially signed a form stating he wanted to make a statement to the police, and gave a verbal statement that he was taking the drugs from Dallas to Chicago for someone else and that they were paying him $1,000 to do so. This is sufficient evidence upon which a jury could find that the Defendant possessed the cocaine with the intent to deliver.

The Defendant specifically challenges conflicting testimony regarding where the pink document with this name on it was found. The Defendant testified that the pink document was found on his person. Detective Acred, Officer Workman, and Officer Ammons each testified that when the green duffel bag was opened, the pink document was found inside. The jury heard both versions of where the pink document was found. By its verdict, they accredited the officer's testimony. We see no reason to disturb the verdict.

Accordingly, we conclude that there was sufficient evidence upon which a jury could conclude beyond a reasonable doubt that the Defendant possessed the kilo of cocaine in the green duffle bag with the intent to deliver it. This evidence is sufficient to sustain the jury's verdict. The Defendant is not entitled the relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE